UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MATTHEW D. REDLIN,

                      Plaintiff,              Case No. 12-12779
                                             Honorable Avern Cohn
                                             Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                      Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [11, 15]**

       Plaintiff Matthew D. Redlin ("Redlin") brings this action pursuant to 42 U.S.C. §405(g),

challenging the final decision of Defendant Commissioner of Social Security ("Commissioner")

denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security

Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary

judgment motions [11, 15], which have been referred to this court for a Report and

Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

**I.     RECOMMENDATION**

       For the reasons set forth below, the court finds that the Administrative Law Judge's

("ALJ") conclusion that Redlin is not disabled under the Act is not supported by substantial

evidence. Accordingly, the court recommends that the Commissioner's Motion for Summary

Judgment [15] be DENIED, Redlin's Motion for Summary Judgment [11] be GRANTED IN

PART to the extent it seeks remand and DENIED IN PART to the extent it seeks an award of

benefits, and that, pursuant to sentence four of 42 U.S.C. §405(g), this case be REMANDED

back to the ALJ for further proceedings consistent with this Recommendation.

## II.    REPORT

### A.    Procedural History

On November 10, 2008, Redlin filed applications for DIB and SSI, alleging disability beginning on November 2, 2008.[1]  (Tr. 125-28).  His claims were denied initially on September 30, 2009.  (Tr. 66-74).  Thereafter, Redlin filed a timely request for an administrative hearing, which was held on November 1, 2010, before ALJ Lantz McClain.  (Tr. 32-62).  Redlin (represented by attorney Karlan Bender) testified at the hearing, as did vocational expert ("VE") Lisa Cox.  (Tr. 37-60).  On January 28, 2011, the ALJ issued a written decision finding that Redlin was not disabled.  (Tr. 14-27).  On April 20, 2012, the Appeals Council denied review. (Tr. 1-3).  Redlin filed for judicial review of the final decision on June 25, 2012 [1].

### B.    Background

#### 1.    Disability Reports

In a November 21, 2008 disability field office report, Redlin reported that his alleged onset date was November 2, 2008.  (Tr. 138).  The claims examiner noted that, during a face-to-face interview, Redlin had difficulty concentrating, but otherwise was cooperative, friendly, and dressed appropriately.  (Tr. 139).

In a November 21, 2008 disability report, Redlin indicated that his ability to work was limited by schizophrenia, depression, and panic attacks.  (Tr. 152).  When describing how these conditions limited his ability to work, Redlin stated:

> The Schizophrenia medicine gives me a bad memory. . . .  With the paranoia, bad memory, and panic attacks I was unable to do my [last] job,

---

[1] Although Redlin's application for SSI is not contained in the record, there is no dispute that he submitted such an application at the same time he applied for DIB, alleging the same onset date. (Doc. #11 at 4; Doc. #15 at 6).

> I was so tired that I would go straight to bed when I got home from work, then I would get up for a while, then go back to bed and slept 11 hours a night. The three mental illnesses that I have completely axaust [sic] me. I don't have enough energy to survive. The more worn out my body feels, the worst my Schizophrenia is. . . . I think that the schizophrenia medine [sic] makes me even more tireder [sic], and messes up my memory.

(*Id.*). Redlin reported that these conditions gradually began to interfere with his ability to work, and that he became unable to work on November 2, 2008. (*Id.*).

Redlin completed high school and earned two associate's degrees. (Tr. 160). Prior to stopping work, Redlin worked as a drive-through cashier at a fast food restaurant, an IT help desk intern, and a lift truck driver in a factory. (Tr. 153). The job he held the longest was that of a lift truck driver (from 1995-2004). (*Id.*). In that job, he performed various types of factory work. (*Id.*). He was required to walk, stand, sit, reach, and handle, grab, or grasp big objects four hours per day, and kneel two hours per day. (Tr. 154). He was frequently required to lift 10 pounds (and had to lift up to 100 pounds). (*Id.*).

Redlin indicated that he had treated with several medical providers regarding his mental impairments. (Tr. 154-58). At the time of the report, he was taking clozapine (for schizophrenia), benztropine (to reduce the side effects of clozapine), omeprazole (for stomach pain), and Wellbutrin XL (for depression). (Tr. 159). He suffered from side effects as a result of these medications: clozapine caused drooling, bad memory, and sleepiness; benztropine caused dry mouth and trouble urinating; and Wellbutrin XL caused sleepiness. (*Id.*). Redlin further reported that he had had numerous blood tests. (Tr. 160-61).

In a function report dated December 1, 2008, Redlin reported that he lives in a house with his family (his parents). (Tr. 162). When asked to describe his daily activities, Redlin indicated that he takes a shower, goes for a walk, watches television, listens to music, does house and/or yard work, and reads. (*Id.*). With his mother's help, he is able to feed his cats and dog. (Tr.

3

163).  His conditions interfere with his sleep:  he states that the schizophrenia wears him out and, despite sleeping 11 hours per night, he "can hardly get up in the morning."  (*Id.*).  He has no problems caring for himself, and he does not need reminders to take care of personal needs or grooming or to take medication.  (Tr. 163-64).  Redlin is able to prepare meals on a daily basis with his mother.  (Tr. 164).  He can perform some housework and yardwork.  (*Id.*).  Every day, he goes outside and walks a mile.  (Tr. 165).  He can drive a car, and he goes out alone.  (*Id.*).  He goes shopping for clothes a "couple times a year," and he is able to pay bills, count change, and handle savings and checking accounts.  (*Id.*).  His hobbies include watching television, listening to music, and reading.  (Tr. 166).  He engages in these activities daily, with the exception of reading (which tires him out).  (*Id.*).  He spends time with his sister, both in person and on the telephone, on a weekly basis.  (*Id.*).  He gets along with family, friends and neighbors, but he has gradually pulled away from his high school friends and now sees them only twice a year.  (Tr. 167).

When asked to identify functions impacted by his condition, Redlin checked: memory; completing tasks; concentration; understanding; and following instructions.  (*Id.*).  He says that clozapine, which he takes for schizophrenia, "messes up" his memory and makes it hard to follow directions and complete tasks.  (*Id.*).  He has trouble following both written and spoken instructions.  (*Id.*).  He gets along with authority figures and has never been fired from a job because of problems getting along with other people.  (Tr. 168).  He does not handle stress or changes in routine well and suffers panic attacks.  (*Id.*).

In a third party function report dated December 1, 2008, Redlin's mother, Linda Redlin, reported that Redlin helps around the house, watches television, listens to music, reads, and goes for walks.  (Tr. 179).  She indicated that, with help, Redlin feeds his pets.  (Tr. 180).  Ms. Redlin

4

further indicated that Redlin sleeps for 11-12 hours per night and "can hardly get up in the morning." (*Id.*). Redlin can help his mother prepare meals, clean the house, mow the lawn, do laundry, and run the dishwasher. (Tr. 181). He is able to drive and goes to the store "a couple times a year" for milk and a few items. (Tr. 182). Ms. Redlin reported that, since Redlin began taking medication, he can pay bills, count change, and handle a checking and savings account. (*Id.*). She reported that Redlin only leaves the house once a week to visit his sister. (Tr. 183). According to Ms. Redlin, her son has difficulty with memory, completing tasks, concentration, understanding, and following instructions. (Tr. 184). She indicated that his medication "messes with his memory" and that schizophrenia causes the other problems. (*Id.*). According to Ms. Redlin, Redlin cannot follow verbal or written instructions well, does not handle stress or changes in routine well, and "stares off in [the] distance." (Tr. 184-85).

In an October 16, 2009 disability appeals report, Redlin reported that his condition had worsened since his last report. (Tr. 205). Specifically, he was having increased difficulty remembering and comprehending things and was sleeping more. (Tr. 205, 208).

### 2. *Plaintiff's Testimony*

At the November 1, 2010 hearing before the ALJ, Redlin testified that he completed high school and subsequently earned two two-year degrees (the first in math and science, the second in electronics/microcomputer repair). (Tr. 37, 55-56). He lives in a house with his parents, who are retired. (*Id.*). He has not worked since November 2, 2008, and his income consists of food stamps and $260 per month from "the state" that he says he will "have to pay back later." (*Id.*).

Most recently, Redlin was employed as a "computer repair guy" by the Lenawee Intermediate School District. (Tr. 39). He worked there for six months before he was fired because of his "abrasive communication" toward coworkers and his inability to perform as

expected. (Tr. 39, 212). Redlin testified that, while employed in this job, he suffered from panic attacks and had a "hard time thinking straight." (Tr. 39). Prior to this, Redlin worked as a drive-through cashier at a fast food restaurant. (Tr. 38). He suffered panic attacks in that job as well and constantly worried that "something horrible" was going to happen. (Tr. 38-39). Since he has stopped working, Redlin has experienced less anxiety and, although he still suffers from paranoia "a little bit every day," it is "a lot better." (Tr. 40).

Typically, Redlin wakes up at 11:00 a.m., after sleeping 10-12 hours, and jogs one mile. (Tr. 41). This clears his head, producing an approximately two-hour period of time in which he can focus enough to read. (Tr. 42). After that, he has difficulty concentrating, so he watches television and then takes a nap in the afternoon. (Tr. 43). After his nap, he jogs another mile and then reads some more. (*Id.*). On Fridays, he spends 60-90 minutes cleaning the house (after he goes running). (*Id.*). He also helps his mother with laundry, cooking, and sweeping. (Tr. 44). He gets along fairly well with his parents, although occasionally his father "gets mad" because Redlin has a hard time focusing on what is being said. (*Id.*). Redlin testified that his short-term memory is "not wonderful"; as an example, he said that, each day, he picks out television shows to watch that evening, but then forgets what he has chosen. (Tr. 44-45).

Redlin testified that before he started taking medication for schizophrenia, he used to hear voices and tried to kill himself. (Tr. 46). The medication "messes with [his] memory," however, and makes it difficult to concentrate. (Tr. 47). He does not talk to any friends on the telephone and sees his high school friends only three or four times a year. (Tr. 47). He drinks six beers every Friday night and Saturday night, alone. (Tr. 53-54). Redlin testified that his psychiatrist has told him that drinking alcohol is "the worst thing" he is doing to himself and that he would be less depressed if he quit drinking, but he is not ready to do so. (Tr. 54).

3.    *Medical Evidence*

(a)    *Treating Physician Records*

Redlin treated primarily with Dr. Maureen Noble, a psychiatrist, at the Lenawee Community Mental Health Authority from at least January of 2007 through October of 2010.[2] Dr. Noble's records will be discussed in chronological order below.

On January 8, 2007, Redlin saw Dr. Noble for a follow-up to some prior session, reporting that he had recently completed his associate's degree, was looking for a job, and felt "somewhat less paranoid and more organized" with a slight increase in his clozapine dose. (Tr. 259). Dr. Noble found Redlin had normal speech, was cooperative, and had a concrete thought process. (Tr. 260). Redlin denied any delusions, hallucinations or suicidal plans. (Tr. 260-261, 264). He denied being depressed, but reported mild anxiety and suspiciousness. (Tr. 261-63). Despite these findings, Dr. Noble described Redlin's clinical status as "unstable" and assigned a Global Assessment of Functioning ("GAF") score of 65,[3] but continued his medications as prescribed. (Tr. 259, 264).

On April 30, 2007, Redlin again saw Dr. Noble, reporting that he felt fatigued, depressed and unmotivated during the day. (Tr. 254). Dr. Noble characterized his symptoms as stable[4] and

---

[2] The record also contains evidence of an inpatient mental health hospitalization in May of 2000. (Tr. 213-21). At that time, Redlin was admitted to the hospital for three days because he was experiencing "an increase in auditory hallucinations and suicidality." (Tr. 213).

[3] GAF examinations measure psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations. *See White v. Commissioner of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009). Between 2007 and 2010, Redlin's GAF scores consistently were between 60 and 70.

[4] As the ALJ noted in his decision, Dr. Noble repeatedly included the phrase "symptoms stable" in the "clinical status" portion of her "impressions." (*See, e.g.,* Tr. 228, 233, 238, 243, 253, 258, 323, 328, 333, 338, 363, 373, 378, 388). This is true despite the fact that, at many of these visits, Dr. Noble described – in narrative form – symptoms that appeared to be worsening. (*See, e.g.,* Tr. 228, 238, 243, 323, 328, 333, 338, 363, 373, 378, 388). Thus, the import of the stock phrase "symptoms stable" is unclear, as discussed in greater detail below.

changed Redlin's primary medication back to generic clozapine (because of packaging issues with the brand-name version). (Tr. 254, 258). Her records indicate that Redlin was drinking one six-pack of beer every Friday and Saturday night. (Tr. 254). Dr. Noble found Redlin to be fully orientated, to have "fair" overall insight (poor with respect to his alcohol use) and "tenuous" judgment. (Tr. 256).

Redlin next saw Dr. Noble on July 9, 2007, reporting that he was doing well overall and that his symptoms were "fairly well controlled." (Tr. 249). Dr. Noble indicated that Redlin was still drinking as noted above, and had the same orientation, insight and judgment. (Tr. 249, 251). On October 8, 2007, Redlin again saw Dr. Noble, reporting that he continued to struggle with paranoia and was having trouble finding a job. (Tr. 244). Dr. Noble noted Redlin's concern that he could not "handle a 10+ hour workday with swing shift scheduling," saying that she endorsed this concern, because such a schedule "is very likely to lead to a worsening of his psychotic symptoms." (Tr. 248). She described his clinical status as "regressing" but continued his medications as prescribed. (Tr. 244, 248). Redlin also saw Dr. Noble on December 17, 2007, reporting that he had obtained a job at Arby's six weeks earlier. (Tr. 239). He stated that working just five hours a day "exhausts him physically" and mentally, and he reported having "some racing thoughts while at work." (Tr. 239, 243).

Redlin next saw Dr. Noble on March 10, 2008, reporting that working at Arby's was "quite exhausting physically," but that he was experiencing no significant paranoia at work, and was getting along with his parents. (Tr. 234). Dr. Noble noted that Redlin made a few comments during the session about Community Mental Health staff that "seemed paranoid in nature." (Tr. 238).

On July 21, 2008, Redlin again saw Dr. Noble, stating that he had obtained a new job (at

the Lenawee Intermediate School District) and had experienced no significant paranoia since starting the job. (Tr. 229). He was relieved to have gotten a "job in the field he has training for (computer repair)" and was "tolerating [the] new job fairly well." (Tr. 233). However, on October 13, 2008, Redlin saw Dr. Noble, expressing frustration with "troubles" that had arisen at his job; he expressed "feeling discouraged and frustrated that he tries so hard and still has struggles on the job." (Tr. 224, 228). He first stated that he was told he was being "let go due to job performance" but then later stated that his boss "asked him to resign." (Tr. 224). Dr. Noble also indicated that there were "reports that he has made some people there uncomfortable." (*Id.*). She again described his symptoms as stable, but added Ambien to his medication regime to address his complaints of occasional sleeplessness. (Tr. 228).

On January 12, 2009, Redlin returned to see Dr. Noble, reporting that he had been fired from his job in November. (Tr. 334). Dr. Noble noted that "based on the things he said, and the nature of his termination letter it sounds like his psychosis was interfering to some degree." (*Id.*). At the time, Redlin reported that he had applied for disability benefits, feeling that he was unable to work. (*Id.*). Upon examination, Dr. Noble noted that Redlin was neatly groomed with appropriate hygiene, and he had appropriate eye contact but restricted affect. (*Id.*). His thoughts were scattered and rambling, but redirectable, and he still had "some paranoid ideation." (*Id.*). Under "Impressions," Noble wrote: "Less paranoid since he lost his job. Admits that symptoms of schizophrenia were more problematic when working, particularly the paranoia. Frustrated about negative symptoms of his schizophrenia." (Tr. 338).

At an April 13, 2009 visit, Dr. Noble noted that Redlin's affect was anxious but stable, and his thoughts were concrete and organized. (Tr. 329). She noted "some indication of recent struggles with increased anxiety," but Redlin was refusing medication changes. (Tr. 333).

9

On June 17, 2009, Redlin again saw Dr. Noble, reporting that he was anxious about his upcoming disability determination and was continuing to struggle with low motivation and low energy. (Tr. 324). Upon examination, Dr. Noble noted that Redlin's affect was anxious and his speech rapid, but unpressured. (Tr. 325). He denied hallucinations but did report some continued paranoia "especially when stressed." (*Id.*). And, right above the section in which she again stated "symptoms stable," Dr. Noble documented her impressions:

> Very anxious about upcoming disability hearing; was perseverative about events that occurred during his hospitalization in 2000 and concerned they would be used against him during the evaluation. Stress seems to exacerbate these types of paranoid thoughts. Also struggling with some negative symptoms of schizophrenia.

(Tr. 328).

On August 24, 2009, Dr. Noble noted that Redlin "remains focused on issues related to his application for disability" and continues to report low motivation and energy. (Tr. 319). On examination, Redlin's affect was anxious and irritable, with limited eye contact. (*Id.*). Dr. Noble noted that Redlin's "negative symptoms of his psychosis are more prominent" and that he continued to have "some paranoia." (Tr. 323). However, she again characterized his symptoms as stable and continued his medications. (*Id.*).

On October 26, 2009, Redlin presented to Dr. Noble with complaints of difficulties with short-term memory and a limited ability to focus and concentrate. (Tr. 389). Dr. Noble noted that Redlin was "quite preoccupied with the fact that his disability application has been referred to an attorney." (*Id.*). In summary, she stated that Redlin "continues with negative and cognitive symptoms related to his schizoaffective disorder, as well as some baseline paranoid ideation." (Tr. 393). Dr. Noble characterized Redlin's symptoms as stable, but noted the possibility of increasing his Wellbutrin dosage to address his concentration issues. (*Id.*). Due to the increased risk of seizures, however, Redlin preferred to continue his current dose. (*Id.*).

On October 28, 2009, Dr. Noble completed a Mental Impairment Questionnaire in which she listed Redlin's diagnoses as schizoaffective disorder and alcohol abuse in sustained partial remission, assigned him a GAF score of 60, and described his prognosis as guarded. (Tr. 346). She indicated that he had had a "partial response of psychotic and depressive symptoms on current medications," but noted that the side effects of these medications included "dizziness, daytime fatigue, [and] impaired concentration." (*Id.*). When asked to describe the clinical findings that demonstrate the severity of Redlin's symptoms, Dr. Noble said:

> Persistent paranoia despite medication compliance; negative symptoms including social withdrawal, anhedonia, decreased energy and motivation; cognitive symptoms including thought disorganization, impaired concentration, impaired information processing.

(*Id.*). Dr. Noble opined that Redlin had mild limitations in activities of daily living, moderate limitations in maintaining social functioning, and marked limitations in maintaining concentration, persistence, or pace.[5] (Tr. 349). When asked to describe additional reasons why Redlin would have difficulty working at a regular job on a sustained basis, Dr. Noble said:

> [Redlin] has made several attempts at employment over the last 2 years. Each time he has had difficulty due to paranoia and impaired social functioning related to his illness. Additionally the cognitive symptoms of his psychotic illness have made concentration and short-term memory poor, leading to difficulty functioning in a work setting.

(Tr. 351).

---

[5] Specifically, Dr. Noble opined that Redlin was seriously limited in his ability to remember work-like procedures; understand, remember, and carry out very short and simple instructions; maintain regular attendance; make simple work-related decisions; perform at a consistent pace without unreasonable rest periods; ask simple questions or request assistance; get along with co-workers and peers; respond appropriately to changes in the routine work setting; and be aware of and take precautions for normal hazards. (Tr. 348). In addition, Dr. Noble opined that Redlin was unable to meet competitive standards in his ability to maintain attention for two-hour segments; sustain ordinary routines without special supervision; work in coordination with or proximity to others; complete a normal workday/workweek without interruptions from psychologically based symptoms; accept instructions and respond appropriately to criticisms from supervisors; and deal with normal work stress. (*Id.*).

Redlin saw Dr. Noble again on January 4, 2010, at which time she noted that his "negative symptoms are more prominent," his affect was anxious, and he was experiencing "intermittent paranoid ideation." (Tr. 384). On March 29, 2010, Redlin presented to Dr. Noble, saying that he was "doing ok." (Tr. 374). Dr. Noble noted, however, that Redlin's affect was mildly anxious, he continued to experience "some paranoia when dealing with others," and that "negative symptoms persist." (*Id.*). On June 14, 2010, Redlin saw Dr. Noble, and she noted that he was continuing to "manifest notable negative symptoms," as well as "intermittent difficulty with paranoid ideation." (Tr. 373). On September 13, 2010, Redlin again saw Dr. Noble, and she noted that although his overall symptoms remained "about the same," he did seem to be a "bit more flustered, overwhelmed." (Tr. 368).

On October 11, 2010, Dr. Noble submitted a statement regarding Redlin's condition, noting a diagnosis of chronic schizoaffective disorder, depressed type. (Tr. 354). She stated that the "symptoms related to this diagnosis are the primary reason [Redlin] has had difficulty obtaining and sustaining employment." (*Id.*). She further indicated that Redlin's secondary diagnosis – of alcohol abuse in sustained partial remission – is "not contributing significantly to his occupational limitations at this time." (*Id.*).

On October 18, 2010, Dr. Noble completed a second Medical Impairment Questionnaire. (Tr. 357-62). When describing Redlin's mental abilities to perform particular types of jobs, Dr. Noble explained: "[Redlin's] paranoid thought process interferes with appropriate interactions with others, particularly in situations when he feels stressed or overwhelmed (*i.e.,* becomes more paranoid in work settings when he feels he is being evaluated or judged; and then becomes more anxious or panicky)." (Tr. 360). As she had done one year earlier, Dr. Noble opined that Redlin had mild limitations in activities of daily living ("with support of his parents"), moderate

12

limitations in maintaining social functioning ("socially isolative"), and marked limitations in maintaining concentration, persistence, or pace. (*Id.*). She opined that Redlin was unable to meet competitive standards in his ability to maintain attention for two-hour segments; work in coordination with or proximity to others; complete a normal workday/workweek without interruptions from psychologically based symptoms; perform at a consistent pace without unreasonable rest periods; accept instructions and respond appropriately to criticisms from supervisors; get along with co-workers and peers; respond appropriately to changes in the routine work setting; and deal with normal work stress. (Tr. 359). When asked to describe additional reasons why Redlin would have difficulty working at a regular job on a sustained basis, Dr. Noble said:

> [Redlin] has made attempts to work over the last 2-3 years. Each job has been short-lived due to increasing paranoid ideation and impaired social functioning due to his mental illness. He has tried working in different settings, but the impairment in functioning persists. His psychosis and impaired cognition/problem-solving due to his illness make concentration and short-term memory poor, and increased stress in the work environment worsens paranoia leading to increased anxiety, panic attacks and impaired social interactions.

(Tr. 362).

### (b)    Consultative and Non-Examining Sources

On July 2, 2009, Redlin underwent a consultative psychological examination with licensed psychologist Nick Boneff. (Tr. 296-99). In his report, Dr. Boneff noted that, although Redlin was not currently employed, he had "worked consistently throughout his adult life in the past." (Tr. 296). He indicated that Redlin's ability to get along with others "varies"; at times, he can interact with others, but then he "gets paranoid." (Tr. 297). Dr. Boneff noted that Redlin was "not in adequate contact with reality, with evidence of an overt thought disorder . . . . [and] did appear to be an accurate historian, without evident tendency to exaggerate or minimize

13

symptoms." (*Id.*).

Redlin acknowledged auditory and visual hallucinations, saying that he is better on his medications but "still talks to God sometimes." (*Id.*). He also acknowledged that, in the past, he felt that he could telepathically communicate with people on television and that he received secret messages from the television. (*Id.*). Redlin remembered the appointment on his own and was able to correctly repeat 6 digits forward and 3 digits backward. (Tr. 297-98). He repeated 3 of 3 objects immediately after stated, but recalled 0 of 3 objects after a delay of three minutes. (*Id.*). Although Redlin knew his age, he did not know his birthdate. (*Id.*). He "stated current events as being that 'they are trying to get people to quit smoking cigarettes, and that people with flooded cars, it ruins the car.'" (*Id.*).

Dr. Boneff concluded that Redlin suffered from schizoaffective disorder, alcohol abuse (in reported long-term remission), and mixed personality disorder with schizoid and paranoid features and evaluated his GAF at 48. (*Id.*). Redlin's prognosis was guarded, and Dr. Boneff felt that he was unable to manage his benefit funds due to his history of alcohol abuse. (*Id.*). Despite these facts, Dr. Boneff opined that Redlin demonstrated a number of cognitive strengths, including in immediate and short-term memory and the capacities to concentrate and pay attention. (*Id.*). He opined that Redlin was capable of engaging successfully in work-type activities of a moderate degree of complexity, involving remembering and performing a multiple step procedure. (Tr. 298-99). In addition, Dr. Boneff indicated that Redlin should be able to perform this work on a sustained basis, optimally with little requirement for cooperative engagement with others. (Tr. 299).

On July 20, 2009, William Schirado, Ph.D., reviewed Redlin's records and completed a Mental Residual Functional Capacity ("RFC") Assessment and a Psychiatric Review Technique.

14

(Tr. 301-18). Dr. Schirado noted that Redlin suffers from an affective disorder (as defined in Listing 12.04), a personality disorder (as defined in Listing 12.08), and a substance addiction disorder (as defined in Listing 12.09). (Tr. 304, 308, 309). Dr. Schirado opined that Redlin is mildly limited in his activities of daily living, and moderately limited in both social functioning and maintaining concentration, persistence, and pace.[6] (Tr. 311). Dr. Schirado concluded that Redlin could perform unskilled work, but not with the general public. (Tr. 317).

### 4.   Vocational Expert's Testimony

Lisa Cox testified as an independent vocational expert ("VE"). (Tr. 55-60). The VE characterized Redlin's past relevant work as ranging from unskilled to skilled in nature, and varying from sedentary to medium in exertion. (Tr. 57-58). The ALJ asked the VE to imagine a claimant of Redlin's age, education, and work experience, with no exertional limitations, but who was limited to doing simple, repetitive tasks and having no more than incidental contact with the public. (Tr. 58). The VE testified that the hypothetical individual would not be capable of performing Redlin's past relevant work. (Tr. 59). However, the VE testified that the hypothetical individual would be capable of working in the positions of conveyor loader II

---

[6] Specifically, in his RFC Assessment, Dr. Schirado opined that Redlin has no limitations in the ability to remember locations and work-like procedures and understand and remember very short and simple (or detailed) instructions. (Tr. 315). Dr. Schirado further opined that Redlin is not significantly limited in his ability to carry out very short and simple instructions; perform activities within a schedule and maintain regular attendance; sustain an ordinary routine without special supervision; make simple work-related decisions; complete a normal workday and work week without interruptions from psychological symptoms; ask simple questions or request assistance; get along with co-workers without distracting them; maintain socially appropriate behavior; and set realistic goals and make plans independently of others. (Tr. 315-16). Dr. Schirado further opined that Redlin is moderately limited in the ability to maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting. (*Id.*). Lastly, Dr. Schirado opined that Redlin is markedly limited in his ability to carry out detailed instructions and interact appropriately with the general public. (*Id.*).

(4,090 jobs in Michigan, 129,180 jobs nationally) and racker (4,090 jobs in Michigan, 129,180 jobs nationally). Upon questioning by Redlin's attorney, the VE testified that if the hypothetical individual could only maintain attention for a two-hour period of time, he would be precluded from competitive work. (Tr. 60).

### C.   Framework for Disability Determinations

Under the Act, DIB and SSI are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Commissioner of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§404.1520, 416.920); *see also Heston v. Commissioner of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Secretary of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.      The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that Redlin is not disabled under the Act. At Step One, the ALJ found that Redlin has not engaged in substantial gainful activity since November 2, 2008, his alleged onset date. (Tr. 16). At Step Two, the ALJ found that Redlin has the severe impairment of schizoaffective disorder.[7] (*Id.*). At Step Three, the ALJ found that Redlin's mental impairment does not meet or medically equal Listing 12.04 (for affective disorders). (Tr. 17).

The ALJ then assessed Redlin's residual functional capacity ("RFC"), concluding that he is capable of performing simple, repetitive tasks with no more than incidental contact with the general public. (Tr. 17-25). At Step Four, the ALJ determined that, at all relevant times, Redlin has been unable to perform his past relevant work. (Tr. 25). At Step Five, the ALJ concluded, based in part on the VE's testimony, that Redlin is capable of performing a significant number of jobs that exist in the national economy. (Tr. 25-26). As a result, the ALJ concluded that Redlin is not disabled under the Act. (Tr. 26).

### E.      Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative

---

[7] The ALJ also found that Redlin's asthma and history of alcohol abuse were non-severe impairments. (Tr. 16). Redlin does not challenge these conclusions.

decision pursuant to 42 U.S.C. §405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Commissioner of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Commissioner of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Commissioner of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Secretary of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Secretary of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record.  *See Kornecky*

*v. Commissioner of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."  *Cutlip v. Secretary of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

> **F.  Analysis**

In his opinion, the ALJ found that Redlin has the severe impairment of schizoaffective disorder, which imposes limitations on his ability to work.  (Tr. 16).  The ALJ then concluded that Redlin has the RFC to perform simple, repetitive tasks with no more than incidental contact with the general public.  (Tr. 17-25).

Redlin argues that the ALJ's RFC finding, and the hypothetical questions subsequently posed to the VE, failed to accurately portray his credible mental limitations.  Specifically, Redlin argues that the ALJ failed to give proper weight to the opinions of Dr. Noble (his treating physician), Dr. Boneff (the consultative examiner), and Dr. Schirado (the state agency medical consultant).  (Doc. #11 at 13-16).  He also argues that the ALJ's RFC finding failed to properly take into account his moderate limitations with respect to concentration, persistence, and pace.

> *1.   The ALJ Violated the Treating Physician Rule*

Redlin argues that the ALJ should have incorporated into his RFC finding Dr. Noble's opinions that he had marked limitations in maintaining concentration, persistence, or pace.  (*Id.* at 13-14).  Specifically, Dr. Noble twice opined – in Medical Impairment Questionnaires completed in October 2009 and October 2010 – that Redlin was unable to meet competitive standards in his ability to maintain attention for two-hour segments; complete a normal

workday/workweek without interruptions from psychologically based symptoms; accept instructions and respond appropriately to criticisms from supervisors; and deal with normal work stress. (Tr. 348, 359). Redlin argues that the ALJ erred in rejecting Dr. Noble's opinions that, for these reasons, he was markedly limited in maintaining concentration, persistence, or pace and in otherwise failing to "explain the degree of weight" given to these opinions. (Doc. #11 at 14).

Under the applicable regulations, an ALJ must give a treating physician's opinion controlling weight where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Commissioner of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. §404.1527(d)(2)). If an ALJ declines to give a treating physician's opinion controlling weight, he must then determine how much weight to give the opinion, "by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakely v. Commissioner of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (citing *Wilson*, 378 F.3d at 544); *see also* 20 C.F.R. §404.1527(d)(2). In addition, and particularly relevant here, the treating source rule contains a procedural, explanatory requirement that an ALJ give "good reasons" for the weight given a treating source opinion. *See Wilson v. Commissioner of Soc. Sec.*, 2012 WL 6737766, at *8 (E.D. Mich. Nov. 19, 2012); Social Security Ruling 96-2p, 1996 WL 374188, at *5 (July 2, 1996) (providing that a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record"). As the Sixth Circuit explained, the purpose of this procedural requirement is two-fold:

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a

> claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied. The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.

*Wilson*, 378 F.3d at 544 (internal quotations and citations omitted).

In this case, the ALJ stated that he did "not give controlling weight" to Dr. Noble's opinions because "the significant limitations [she noted] are not supported by the evidence of record." (Tr. 24). Despite declining to give Dr. Noble's opinions controlling weight, the ALJ did not mention – let alone discuss – the majority of the factors discussed above, including the length of Redlin's treatment relationship with Dr. Noble (in excess of three years), the frequency of examination (monthly), the nature and extent of the treatment relationship, and Dr. Noble's specialization. Rather, he merely characterized Dr. Noble's opinions regarding Redlin's limitations as "extreme" and summarily rejected them, saying that they were "not substantiated by the evidence of record, including Dr. Noble's own treatment notes of [Redlin], which have been discussed at length." (Tr. 23-24).

As an initial matter, it is not clear at all that Dr. Noble's opinions are, in fact, inconsistent with her treatment notes. For example, when asked to indicate the clinical findings that demonstrate the severity of Redlin's symptoms, Dr. Noble described:

> Persistent paranoia despite medication compliance; negative symptoms including social withdrawal, anhedonia, decreased energy and motivation; cognitive symptoms, including thought disorganization, impaired concentration, impaired information processing.

(Tr. 346). All of these symptoms are documented in Dr. Noble's treatment notes. (*See, e.g.,* Tr. 244 ("continues to struggle with paranoia"); 253 ("fatigued, depressed and amotivated"); 334 (thoughts were "scattered" and "rambling"); 389 ("complaining of limited focus and concentration")). Moreover, these findings – specifically, that Redlin experiences "thought

disorganization, impaired concentration, [and] impaired information processing" – are entirely consistent with Dr. Boneff's conclusion that Redlin was "not in adequate contact with reality, with evidence of an overt thought disorder …." (Tr. 297). *See also infra* at 24-25. In short, the ALJ's bald rejection of Dr. Noble's opinions as "not substantiated by the evidence of record" does not, without more, satisfy the "reason-giving" requirement.[8] *Wilson*, 378 F.3d at 544.

Moreover, even if Dr. Noble's opinion was inconsistent with other evidence in the record, "a treating source's medical opinions remain entitled to deference and must be weighed using the factors provided in 20 C.F.R. §§404.1527 and 416.927." *See, e.g., Friend v. Commissioner of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010). As the *Friend* court held:

> Put simply, it is not enough to dismiss a treating physician's opinion as "incompatible" with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick.

*Id.* In this case, although the ALJ did "discuss[] at length" Dr. Noble's treatment records, and concluded that her opinions were inconsistent with these records, he failed to tie the two together by explaining *how* the treatment records support his conclusion that Dr. Noble's opinions were

---

[8] In rejecting Dr. Noble's opinions, the ALJ also seemed to rely heavily on the fact that her treatment notes contain "continual references that [Redlin's] 'symptoms are stable.'" (Tr. 23). However, at least as considered by the ALJ here, these particular notes do not constitute substantial evidence in support of his conclusion. First, the mere fact that Dr. Noble apparently repeatedly described Redlin's "clinical status" with the words "symptoms stable" is hardly the most informative evidence, relatively speaking. Importantly, where, as here, Dr. Noble opined that Redlin's symptoms render him markedly limited in maintaining concentration, persistence, and pace, the fact that such symptoms were "stable" could actually *support* his claim of ongoing disability. At a minimum, the ALJ should have explained why the description of Redlin's symptoms as "stable" cuts in favor of a conclusion that he is not disabled. Second, on each set of treatment notes, directly above the "clinical status" section, Dr. Noble described her "impressions" in detail, and these impressions frequently belie a conclusion that Redlin's symptoms were, in fact, stable. *E.g.*, (Tr. 384) ("negative symptoms are more prominent" in January 2010); (Tr. 374) ("some paranoia when dealing with others" and "negative symptoms persist" in March 2010); and (Tr. 373) ("notable negative symptoms" and "intermittent difficulty with paranoid ideation" in June 2010). *See also supra* fn. 4. Rather than simply concluding that the existence of "stable symptoms" supported the ALJ's conclusion, the ALJ should have more thoroughly analyzed the issue in light of the foregoing matters.

"extreme" and, thus, why those opinions were not entitled to controlling weight.  In other words, the ALJ's conclusory statement – that Dr. Noble's opinions as to Redlin's "extreme limitations are not substantiated by the evidence of record, including Dr. Noble's own treatment notes" – does not comply with the treating physician rule because it fails to identify, with any level of specificity, the evidence which supposedly undermines her opinions that Redlin is markedly limited in maintaining concentration, persistence, or pace.  *See Wilson*, 2012 WL 6737766, at *9 ("… even though the ALJ cited evidence that was inconsistent with [the treating physician], the ALJ made no attempt to identify which of [that physician's] findings were undermined by which evidence as plainly required by this Circuit.  It is not for the Court to undertake this analysis in the first instance.") (internal citations omitted).

The court recognizes that there arguably is some evidence, both in Dr. Noble's treatment notes and in Dr. Boneff's opinion, suggesting lesser mental limitations than those found by Dr. Noble in her October 2009 and October 2010 opinions.  For example, prior to Redlin's alleged onset date, Dr. Noble noted that Redlin's symptoms were "fairly well controlled" in July 2007 (Tr. 249) and that he was experiencing "no significant paranoia at work" in March 2008 (Tr. 234).  On the other hand, as noted above, *see e.g., supra* fn. 8, other of Dr. Noble's treatment notes (particularly some of the more recent ones) and some of Dr. Boneff's findings, *supra* at 13-14; *infra* at 24, seem entirely consistent with her opinions.  While it is certainly possible that two competing and contrary opinions could each be supported by "substantial evidence," *Cutlip*, 25 F.3d at 286, the ALJ's decision must still be the product of a properly reasoned and supported analysis.  *See supra* at 20-22.  *See also Wilson*, 378 F.3d at 544; Social Security Ruling 96-2p, 1996 WL 374188, at *5 (July 2, 1996) (a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence

in the case record"); *Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011) (remanding when ALJ failed to assign a specific weight to a treating source's opinion or explain why part of that opinion was adopted while other parts were rejected because, "[w]hile it may be true that [the] opinion . . . should not ultimately be accorded controlling weight as to [claimant]'s RFC, the ALJ did not go through the required analysis to arrive at that conclusion"). Here, a full review of the record shows that the ALJ erred by baldly concluding that Dr. Noble's opinions were "not substantiated by the evidence of record," and by failing to follow the treating physician rule's requirements.

Finally, the ALJ also appears to have rejected Dr. Noble's opinions (as well as evidence offered by Redlin's mother) as being "inconsistent with [the] actual evaluation by Dr. Boneff," including his conclusion that Redlin is capable of engaging successfully in work-type activities of a moderate degree of complexity. (Tr. 24-25). The court notes, however, that, as with Dr. Noble's notes, the ALJ failed to adequately discuss the competing evidence present in Dr. Boneff's opinion. For example, while Dr. Boneff opined that Redlin demonstrated a number of cognitive strengths, including in immediate and short-term memory, he noted that Redlin recalled 0 of 3 objects after a delay of 3 minutes and did not know his birthdate. (Tr. 298). He further observed at various points that Redlin was "not in adequate contact with reality, with evidence of an overt thought disorder," acknowledged auditory and visual hallucinations, and "stated current events as being that 'they are trying to get people to quit smoking cigarettes, and that people with flooded cars, it ruins the car.'" (Tr. 297-98). Dr. Boneff found that Redlin had a schizoaffective disorder and a mixed personality disorder with schizoid and paranoid features. (Tr. 298). He evaluated Redlin's GAF at 48 and described his prognosis as guarded. (*Id.*).

Yet, rather than acknowledging and addressing this potentially conflicting evidence, the

24

ALJ simply failed to mention or address these portions of Dr. Boneff's findings. While the ALJ need not address every piece of evidence in the record, *Kornecky*, 167 F. App'x at 508, he does not fairly discharge his duties when he fails to discuss significant contradictory portions of the very records on which he relies the most. *See Minor v. Commissioner of Social Sec.*, 2013 WL 264348, at *17 (6th Cir., Jan. 24, 2013) (citing *Germany–Johnson v. Commissioner of Soc. Sec.*, 313 F. App'x 771, 778 (6th Cir. 2008) and *Boulis–Gasche v. Commissioner of Soc. Sec.*, 451 F. App'x 488, 494 (6th Cir. 2011).

### 2.    *Remand is Appropriate*

As the Sixth Circuit has stressed, it is incumbent upon the ALJ to assess what weight a treating source's opinion deserves and to specifically articulate that weight and the "good reasons" supporting it; when the ALJ fails to do so, remand is appropriate. *See, e.g.*, *Cole*, 661 F.3d at 939 (remanding when ALJ failed to assign a specific weight to a treating source's opinion or explain why part of that opinion was adopted while other parts were rejected because, "[w]hile it may be true that [the] opinion . . . should not ultimately be accorded controlling weight as to [claimant]'s RFC, the ALJ did not go through the required analysis to arrive at that conclusion"); *Sawdy v. Commissioner of Soc. Sec.*, 436 F. App'x 551, 553-54 (6th Cir. 2011) ("[W]hen an ALJ violates the treating-source rule, '[w]e do not hesitate to remand,' and 'we will continue remanding when we encounter opinions from ALJ[s] that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion.") (quoting *Hensley v. Astrue,* 573 F.3d 263, 267 (6th Cir. 2009)); *Friend*, 375 F. App'x at 551 (an ALJ's "failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack

of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record") (internal quotations omitted).

The court recognizes that there may be cases "where the Commissioner has met the goal of §1527(d)(2)—the provision of the procedural safeguard of reasons—even though [he] has not complied with the terms of the regulation." *Friend*, 375 F. App'x at 551 (internal quotations omitted). Thus, "If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused." *Id.*; *see also Cole*, 661 F.3d at 940.[9] In this case, however, the court does not see such an "obvious[] conflict" between Dr. Noble's opinions about Redlin's marked limitations on the one hand, and her treatment notes and Dr. Boneff's opinion on the other, that it can conclude the ALJ's reasoning is necessarily supported by "good reasons." *Cole*, 661 F.3d at 940 ("It may be true that, on remand, the Commissioner reaches the same conclusion as to [claimant]'s disability while complying with the treating physician rule and the good reasons requirement; however, [claimant] will then be able to understand the Commissioner's rationale and the procedure through which the decision was reached. The case must be remanded.").

Given this case law, Dr. Noble's role as Redlin's long-time treating physician, and all of the foregoing analysis, the court concludes that the ALJ erred in failing to properly apply the treating physician rule. Without proper consideration of the opinions of Redlin's treating physician, the court's RFC finding – which did not take into account Dr. Noble's opinions that

---

[9] The Sixth Circuit also has indicated that an ALJ's error in applying the treating physician rule may be deemed harmless if "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it" or "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion." *Friend*, 375 F. App'x at 551 (internal quotations omitted). This court finds neither circumstance present here.

Redlin was markedly limited in maintaining concentration, persistence, and pace – is not supported by substantial evidence. As a result, the court recommends remanding this matter to the ALJ to more directly and thoroughly analyze the matters discussed above, including how Dr. Noble's records substantiate, or fail to substantiate, her opinions.[10]

## III.    CONCLUSION

For the foregoing reasons, the court RECOMMENDS that the Commissioner's Motion for Summary Judgment [15] be DENIED, Redlin's Motion for Summary Judgment [11] be GRANTED IN PART, the ALJ's decision be REVERSED, and this case be REMANDED for further proceedings consistent with this Recommendation.


Dated: March 27, 2013                          s/David R. Grand
Ann Arbor, Michigan                            DAVID R. GRAND
                                               United States Magistrate Judge


## NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this

---

[10] Redlin raises other issues, including that the ALJ erred in: (1) failing to properly account for his moderate limitations with respect to concentration, persistence, and pace, and (2) failing to pose a proper hypothetical question to the VE. (Doc. #11 at 11-16). Because this court concludes that the ALJ erred in weighing the medical opinions and formulating Redlin's RFC and recommends remanding the case back to the ALJ for proper consideration of those matters, it need not address these additional issues.

Report and Recommendation.  *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991);

*Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to

E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

**<u>CERTIFICATE OF SERVICE</u>**

     The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 27, 2013.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager
